**In re ARDENT, INC., et al., Debtors.**

No. 01–2086.

United States Bankruptcy Court,
District of Columbia.

Oct. 6, 2003.

Roger Frankel, Michael J. Lichtenstein, Swidler, Berlin, Shereff, Friedman, LLP, Washington, DC, for Ardent Liquidating LLC.

John F. Dienelt, Piper Rudnick, LLP, Washington, DC, Daniel M. Eliades, Forman Holt & Ellkdes, LLC, Rochelle Park, NJ, for Cendant Corp.

## DECISION REGARDING OBJECTION TO CLAIM OF CENDANT CORP.

S. MARTIN TEEL, JR., Bankruptcy Judge.

This order addresses the objection of Ardent Liquidating LLC ("Ardent") to the claim of Cendant Corporation ("Cendant"). The objection will be overruled.

### I

Cendant is the parent of companies that, as franchisors, operate real estate brokerage franchise systems under the names of Century 21, ERA, and Coldwell Banker. Cais, Inc. ("Cais") was the predecessor-in-interest of one of the debtors in this case,

and Cendant's claim arises from a contract with Cais.

In August 2000, Cais and Cendant entered into a contract (the "Agreement"). Cendant agreed that it would exclusively recommend Cais to the franchisees of Cendant's franchisors and the sales associates of the franchisees ("the Customers"), as a vendor of high-speed internet connection services. Although Cendant agreed to actively promote Cais as a vendor of such services, Cais itself was responsible for developing, producing, and disseminating marketing materials to promote its services.

Cais, as "Vendor," agreed that:

*Access Fee.* Vendor shall pay to Cendant, in immediately available funds, the sum of Seven Million Dollars ($7,000,-000) (the "Access Fee") as compensation to Cendant for its selection of Vendor as a preferred vendor of the Services and for providing access to the Customers. The Access Fee shall be paid in fourteen (14) equal quarterly installments of Five Hundred Thousand Dollars ($500,000) each. The first payment shall be due at the time this Agreement is executed by the parties and each successive payment shall be due not later than the first day of the every third month thereafter during the Term (each November 2, February 2, May 2 and August 2). **Said fee is fully earned upon payment and shall not be subject to refund or reduction regardless of the termination of this Agreement for any reason. In the event of a termination of this Agreement, other than for Vendor's breach, Vendor's obligation to pay the Access Fee shall cease.** Termination of this Agreement shall not affect the rights

and obligations of Vendor or any Customer under any then-existing service agreement between Vendor and such Customer.

Agreement § 3 (emphasis added).[1] After paying an initial installment of $500,000 on the Access Fee, Cais failed to comply with its obligation to make $500,000 quarterly installment payments on the Access Fee. Cendant terminated the Agreement based on these defaults. The quarterly installments that had come due as of the date of termination stood at $1,500,000, and Ardent does not contest its liability for that $1,500,000. However, Cendant claims that it is owed an additional $5,000,000 on the Access Fee (that is, the full amount of the $7,000,000 Access Fee less $500,000 already paid and less $1,500,000 not disputed as being owed).

## II

Ardent objects that this $5,000,000 is not owed based on five arguments. Applying the law of New Jersey, which governs the enforcement of the Agreement, the court will reject all of Ardent's arguments.

### A.

◼ Ardent argues, first, that:

There is nothing in the Agreement that entitles Cendant to seek payment of an additional $5 million that was not earned prior to Cendant's termination of the Agreement. Indeed, the Agreement states that each portion of the fee "is fully earned upon payment."

Ardent's Reply at 1. Section 3 of the Agreement called for the quarterly installment payments of the Access Fee to be paid **at the start of each quarter.** Ac-

---

1. In addition, the Agreement provided that Cais would pay Cendant certain "recurring commissions" based on each customer hooked up to one of the internet services being sold by Cais. *See* Agreement § 4. Those recurring commissions included in Cendant's proof of claim are not in dispute.

cordingly, if the Agreement were terminated by Cais in the midst of a quarter (pursuant to certain conditions permitting it to terminate the Agreement), "[s]aid fee is fully earned upon payment and shall not be subject to refund or reduction regardless of the termination of this Agreement for any reason." This quoted language would permit Cendant to retain the payment even though the Agreement was terminated in the midst of the quarter. Accordingly, this quoted language does not bear the interpretation that Ardent places upon it of demonstrating that upon termination of the Agreement by Cendant, no further quarterly fees would come due. Indeed, the following sentence evidences that only upon a termination other than for breach by Cais would the obligation to pay the Access Fee cease:

> In the event of a termination of this Agreement, *other than for Vendor's breach,* Vendor's obligation to pay the Access Fee shall cease.

Agreement § 3 (emphasis added). Cendant terminated the Agreement for Cais's breach, and, accordingly, under this sentence, Cais's obligation to pay the Access Fee did not cease. Even without that sentence, Cais's obligation remained an obligation that it would have had to perform had the contract not been terminated based on its default, and hence would be a measure of the general damages suffered by Cendant, as discussed with respect to other arguments.

The Agreement elsewhere expressly states that certain obligations are to survive the termination of the Agreement. *See* Agreement § 13(d) regarding confidentiality and non-disclosure obligations. However, this simply makes clear that the parties remain subject to such obligations and required to perform them (including the party not in default who generally is excused from future performance, but not as to promises of confidentiality which implicitly survive termination); it relates, in other words, to a matter (confidentiality) whose survival the parties might want to make explicit instead of implicit. It does not purport to address an issue of damages upon termination, the wholly different issue that Cendant's claim presents, as to which there would be no doubt that damage claims survive, including the claim for the unperformed promise of paying the Access Fee.

Moreover, the Agreement expressly provides for waiver of certain claims.[2] So it could just as illogically be argued that the absence of an express waiver demonstrates that the damage remedy survived. In other words, the absence of an express waiver of the Access Fee creates an illogical inference of non-waiver that would cancel out any illogical inference of non-survival drawn from the absence of an express provision for the survival of the Access Fee (as an obligation or as an element of damages).

In any event, the express provision for survival of certain obligations fails to negative the clear intent expressed in Agreement § 3 that only a termination other than one based on a breach by Cais would relieve Cais of the obligation to pay the full Access Fee, an intent that can only mean that Cais's obligation was to survive, not that it was to cease. It was unnecessary expressly to state that which was clearly intended and expressed in the limitation of when Access Fee obligations would cease.

**2.** *See* Agreement § 5(d)(i) (regarding claims against Cendant for losses arising out of any occurrence relating to the services Cais was to provide to Customers) and Agreement § 5(e) (waiving claims for indirect, special or consequential damages).

B.

Ardent argues, second, that the $5,000,000 claim is a form of lost profits that was waived by the express waiver in § 5(e) of the Agreement of "indirect, special, or consequential damages," including lost profits.[3] However, Cendant's claim based on the Access Fee is for "direct or general damages," as that term is used in New Jersey law,[4] in contrast to "indirect, special or consequential damages" (terms that all mean the same thing: the opposite of general or direct damages).[5] The distinction between general damages and special damages was recognized by the observation in *Marcus & Co., Inc. v. K.L.G. Baking Co., Inc.*, 122 N.J.L. 202, 3 A.2d 627, 631 (1939), that a party to a contract:

is under a duty to respond in damages for such losses as would probably result in the ordinary course of things from a breach of the contract under the special circumstances known to the parties at the time it was made. Such are ordinarily considered by the law as reasonably within the contemplation of both parties to the contract. Where the **special circumstances** are not known to the party chargeable with the breach, the law deems ... that he "had in his contemplation the amount of **injury which would arise generally**, and in the great multitude of cases **not affected by any special circumstances**, from such a breach of contract," [quoting *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145, 151 (1854)] and his liability is measured accordingly.

[Citations omitted; emphasis added.][6]

Consequential damages include

---

**3.** Section 5(e) of the Agreement provided:

Neither party shall be responsible to the other party for indirect, special or consequential damages under any tort (including negligence), contract, strict liability or other legal or equitable theory in connection with each party's performance of its obligations under this Agreement including lost profits or interruption of business (regardless of whether a party has been advised of the possibility of or could have foreseen such damages). The limitation of liability provided under this subsection (e) shall not apply with respect to (i) third party claims and/or (ii) the willful misconduct or gross negligence of a party.

**4.** The distinction between "general or direct" damages and consequential (or special or indirect damages) was explained by the Supreme Court of New Jersey in a case involving a clause excluding consequential damages in a contract for the sale of goods:

Potential liability for **consequential damages** in commercial contexts, usually in the form of the buyer's lost profits from the use or resale of the goods in its business, is enormous in comparison to the contract price of the goods. On the other hand, the **general or direct damages** that a buyer may suffer upon a seller's breach are finite and

can be gauged at a maximum amount either in terms of the contract price or market price of the goods to be sold. Potential **consequential losses** are a much different proposition. They can exceed, and most likely will exceed, the value of the goods by an unknown quantum, depending not so much on the actions and machinations of the seller as on the individual operating structure of the buyer and on the buyer's contracts and relationships with third parties.

*Kearney & Trecker Corp. v. Master Engraving Co.*, 107 N.J. 584, 527 A.2d 429, 433 (1987) (quoting Anderson, "Failure of Essential Purpose and Essential Failure on Purpose: A Look at Section 2–719 of the Uniform Commercial Code," 32 Sw. L.J. 759, 774 (1977)) (emphasis added).

**5.** *See Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co.*, 226 N.J.Super. 200, 543 A.2d 1020, 1032–33 (Ct.App.Div.1988) (drawing distinction between direct damages and consequential damages) *Seaman v. U.S. Steel Corp.*, 166 N.J.Super. 467, 400 A.2d 90, 92 (Ct.App.Div.1979), *certif. denied*, 81 N.J. 282, 405 A.2d 826 (1979) (consequential and special damages are same).

**6.** In *Marcus & Co.*, the breach was of a sale of goods, but the rule applies to other contracts

such damages as lost profits that the non-defaulting party would have earned after performance had the defaulting party performed. *See George H. Swatek, Inc. v. N. Star Graphics, Inc.,* 246 N.J.Super. 281, 587 A.2d 629, 631 (App.Div.1991). The loss arising from Cais's nonperformance of the obligation to pay the Access Fee is a general or direct damage, the performance called for by the contract,[7] not a loss of profits that Cendant might have realized after the fact had Cais performed that obligation.

### C.

Ardent argues, third, that Cendant suffered no actual damages justifying recovery of the $5,000,000 that came due only after the date of termination of the Agreement because Cendant was not required to perform in the post-termination period. Although Cendant's performance under the contract from which it was excused by reason of termination is relevant to the issue of measuring damages, it does not alter the outcome.

#### 1.

■ Essentially, Ardent's argument is that it is unreasonable to hold Cais to the obligation to pay the Access Fee when Cendant was not required to perform its end of the bargain after termination of the Agreement. The court has no power to produce a fairer or more reasonable result

when the contract's terms are clear and unambiguous. *See* 11 Richard A. Lord, *Williston on Contracts* § 32:11 at nn. 92 and 93 (4th ed. as updated July 2003) ("the courts will not indulge in artificial interpretations or abnormal implications in order to save a party from a bad bargain. The court may not, under the guise of interpretation, make a new contract for the parties.") (footnotes omitted).

■ Although in interpreting contracts, "the most fair and reasonable construction, imputing the least hardship on either of the contracting parties, should be adopted [citation omitted], so that neither will have an unfair or unreasonable advantage over the other," *Tessmar v. Grosner,* 23 N.J. 193, 128 A.2d 467, 471 (1957), that quoted rule only applies when the contract is susceptible of differing interpretations:

> where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written. *Kampf v. Franklin Life Ins. Co.,* 33 N.J. 36, 43, 161 A.2d 717 (1960); *Levison v. Weintraub,* 215 N.J.Super. 273, 276, 521 A.2d 909 (App.Div.), *certif. denied,* 107 N.J. 650, 527 A.2d 470 (1987). The court has no right "to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently." *Id.; Brick Tp. Mun. Util.*

---

as well. *See e.g., Weiss v. Revenue Bldg. & Loan Ass'n,* 116 N.J.L. 208, 182 A. 891, 892–93 (1936) (applying same rule to a breach of a contract for lease of real property). As explained in *Ebasco Services, Inc. v. Pa. Power & Light Co.,* 460 F.Supp. 163, 213 n. 62 (E.D.Pa. 1978):

> Although the primary issue in *Hadley* was recoverability, the case also offered guidance on categorization. That is, *Hadley* focused on the foreseeability necessary in order to recover consequential damages, but in doing so it characterized general and consequential damage. Under *Hadley* and

the contract case law that has followed it, ordinariness or directness in the usual case is the hallmark of a general or direct damage; presence of peculiar circumstances signals special or consequential damages.

7. As such, the damages, of course, readily satisfy the requirements of foreseeability, the second prong of *Hadley* (*see* n.7, *supra*). That Cais may not have expected to default does not negate the foreseeability of the direct damage to Cendant arising from Cais's nonperformance of its obligation to pay Cendant the Access Fee.

*Auth. v. Diversified R.B. & T.,* 171 N.J.Super. 397, 402, 409 A.2d 806 (App. Div.1979). Nor may the courts remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other. *James v. Federal Ins. Co.,* 5 N.J. 21, 24, 73 A.2d 720 (1950).

*J.L. Davis & Assocs. v. Heidler,* 263 N.J.Super. 264, 622 A.2d 923 (Ct.App.Div. 1993). Here the contract is insusceptible of any interpretation other than that even if Cendant terminated the Agreement based on Cais's default, Cais's required performance included payment of the Access Fee. Whether that required performance gives Cendant the right to recover the Access Fee as damages is, however, a different issue, as discussed below.

**2.**

■ New Jersey contract law recognizes that contract damages place an injured party in the same position that the party would have occupied had the other party performed as promised. *See In re Liquidation of Integrity Ins. Co.,* 147 N.J. 128, 685 A.2d 1286, 1290 (1996); *525 Main St. Corp. v. Eagle Roofing Co.,* 34 N.J. 251, 168 A.2d 33 (1961). Here, that means that an element of Cendant's damages is the amount of the Access Fee that Cais failed to pay, however bad, in hindsight, that makes the deal that Cais struck.

**3.**

■ This does not mean that the performance of which Cendant was excused (upon terminating the Agreement) is irrelevant. Although Cendant is entitled to the value of performance, that value is measured by "the performance of both parties and not the value of the defendant's performance alone." 24 Richard A. Lord, *Williston on Contracts* § 64.3 (4th ed. as updated May 2003). That is to say, in awarding contract damages, the injured party's recovery should be reduced by expenses of performance of which it was excused by reason of the termination of the contract. *See Magnet Resources, Inc. v. Summit MRI, Inc.,* 318 N.J.Super. 275, 723 A.2d 976, 985 (App.Div.1998).

However, Ardent has not shown that Cendant's active promotion of Cais's services would have cost Cendant anything.[8] Under F.R. Bankr.P. 3001(f), Cendant's claim is prima facie valid, and in the absence of evidence that Cendant avoided any expense, the claim remains valid in the full amount.

**D.**

■ Ardent argues, fourth, that the $5,000,000 sought by Cendant for the post-termination period is in the nature of liquidated damages, and is unallowable by reason of its penal character. Liquidated damage provisions are stricken as penal if they are not a reasonable forecast of just compensation for the actual injury resulting from the breach. *Wasserman's Inc. v. Township of Middletown,* 137 N.J. 238, 645 A.2d 100, 105, 108–109 (1994).

■ However, liquidated damages are by definition a substitute for actual damages. Here, Cendant seeks only its actual damages (its evidence being the loss of the Access Fee Cais promised it would pay, with no countervailing evidence introduced by Ardent that Cendant mitigated its damages) not some liquidated amount agreed to by the parties in lieu of computing the actual damages. Citing *MetLife*

---

8. For example, Cendant may already have been sending a newsletter periodically to its franchisors' franchisees which would have been the vehicle for making such promotions. Cais itself was responsible for preparing and disseminating marketing materials.

*Capital Fincl. Corp. v. Washington Ave. Assocs.*, 159 N.J. 484, 732 A.2d 493 (1999), and *Westmount Country Club v. Kameny*, 82 N.J.Super. 200, 197 A.2d 379 (App.Div. 1964), Ardent states that under New Jersey law:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. **A term fixing unreasonably large liquidated damages is void as a penalty.**

*See MetLife,* 732 A.2d at 499 (emphasis added) (quoting the Uniform Commercial Code ("UCC") provision on liquidated damages, adopted in New Jersey as N.J.A.A. 12A:2–718, and embracing a similarly worded test from Restatement (Second) of Contracts § 356 (1981) that was adopted to harmonize the Restatement with the UCC provision). Again, the damages that Cendant seeks to recover are not stipulated damages in lieu of proof of actual damages, but its actual damages, and hence the test adopted in *MetLife* does not come into play.

*Westmount* provides a useful illustration of this principle, and a useful contrast to this case. In *Westmount,* a contract clause required Kameny to pay his fees for a one-year club membership, even though the membership was canceled mid-year. *Westmount,* 197 A.2d at 380–81. *Westmount* did not hold that a fixed periodic fee is an impermissible element in fixing actual damages, but only that the stipulated damage clause was unreasonable and hence a penalty, instead of permissible liquidated damages: Mr. Kameny ought to have been allowed to introduce evidence of mitigation of damages in fixing the actual damages. *Westmount,* 197 A.2d at 383–84. Unlike the club in *Westmount,* Cendant never contended that the periodic fee provision at issue is a stipulated damages clause precluding Ardent from presenting mitigation evidence. Ardent has simply failed to put on any evidence regarding mitigation of damages, and in default thereof the Access Fee is the appropriate amount of actual damages.

## E.

■ Ardent argues, fifth, that Cendant has failed to show that Cendant did not mitigate its damages (or that Cendant took any steps to attempt to mitigate its damages). However, under New Jersey law, Ardent bears the burden of showing that Cendant mitigated its damages (or, if Cendant was required to attempt to mitigate its damages, that it failed to make such attempts). *See Magnet Resources, Inc.,* 723 A.2d at 987 (applying the general rule set forth in dictum in *Sommer v. Kridel,* 74 N.J. 446, 378 A.2d 767 (1977)). The intervention of bankruptcy does not alter that burden of proof. *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) ("one who asserts a claim is entitled to the burden of proof that normally comes with it").

■ In any event, even if it is assumed instead that New Jersey law places on the non-breaching party the burden of proof on the issue of mitigation of damages, Cendant's claim is prima facie valid under F.R. Bankr.P. 3001(f). Ardent offered no evidence regarding mitigation of damages. Only had Ardent introduced such evidence would Cendant have been required (if New Jersey law indeed puts the burden of proof on the non-breaching party) to present evidence to negate Ardent's evidence.[9]

---

**9.** *See Lundell v. Anchor Construction Special-* *ists, Inc.,* 223 F.3d 1035, 1039 (9th Cir.2000);

### III

In accordance with the foregoing, Cendant's claim will be allowed in full.

*McGee v. O'Connor (In re O'Connor)*, 153 F.3d 258, 260 (5th Cir.1998); *Carlson v. United States (In re Carlson)*, 126 F.3d 915, 921–22 (7th Cir.1997), *cert. denied*, 523 U.S. 1060, 118 S.Ct. 1388, 140 L.Ed.2d 647 (1998); *Franchise Tax Board of Calif. v. MacFarlane (In re MacFarlane)*, 83 F.3d 1041 (9th Cir. 1996), *cert. denied*, 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997); *Brown v. IRS (In re Brown)*, 82 F.3d 801, 805 (8th Cir. 1996); *Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir.1993); *Placid Oil Co. v. IRS (In re Placid Oil Co.)*, 988 F.2d 554, 557 (5th Cir. 1993); *In re Fullmer*, 962 F.2d 1463, 1466 (10th Cir.1992); *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3rd Cir.1992); *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir.1991).