# United States Court of Appeals
## For the First Circuit

Nos. 13-1437
     13-1513
     13-1514

ATLANTECH INCORPORATED,

Plaintiff, Appellant/Cross-Appellee,

v.

AMERICAN PANEL CORPORATION, APC AQUISITION CORPORATION
INCORPORATED, and UNIVERSAL AVIONICS SYSTEMS CORPORATION,

Defendants, Appellees/Cross-Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, <u>District Judge</u>]

Before

Selya, Stahl, and Lipez,
<u>Circuit Judges</u>.

Irwin B. Schwartz, with whom Nicholas R. Cassie and BLA Schwartz, PC were on brief, for Atlantech, Inc.
Michael J. King, with whom John F. Farraher, Jr. and Greenberg Taurig, LLP were on brief, for American Panel Corporation and Universal Avionics Systems Corporation.
John A. Christy, with whom Michelle Roback Kraynak, Schreeder, Wheeler & Flint, LLP, Justin P. O'Brien, and Collora LLP were on brief, for APC Acquisition Corporation, Inc.

February 20, 2014

**STAHL, Circuit Judge**.  Plaintiff Atlantech Incorporated ("Atlantech") filed a seven-count amended complaint against Defendants American Panel Corporation ("APC"), APC Acquisition Corporation, Inc. ("APC Acquisition"), and Universal Avionics Systems Corporation ("Universal") (collectively, "Defendants") asserting claims related to the alleged breach of various agreements involving the sale of aviation equipment.  After a jury trial, the parties filed post-trial motions, which the district court resolved partially in favor of Atlantech and partially in favor of Defendants.  Atlantech appeals and Defendants cross-appeal.  We affirm.

## I. FACTUAL BACKGROUND

Atlantech was a dealer of aircraft LCD displays and APC was its primary product supplier.  Pursuant to an August 2002 agreement, Atlantech was the exclusive vendor to Ulyanovsk Instrument Manufacturing Design Bureau ("UIMDB"), which integrated the displays into its own product for use in aircraft instrument panels.  On December 2, 2003, APC, operating at the time as a division of Universal, entered into a Memorandum of Agreement with Atlantech for the sale of 103 1040-100 AMLCD displays ("1040 MOA").  At the same time, APC and Atlantech reached a Non-Circumvention Agreement ("NCA") preventing APC from  conducting direct business with UIMDB for two years after the last completed transaction between APC and Atlantech.

-2-

The 1040 MOA required APC to "support" the product through December 31, 2012 ("Support Agreement"); the parties dispute the meaning of the word "support" in the context of this provision. The Support Agreement further required APC to maintain "Data Warehouse Documents" recording the intellectual property necessary for the production and repair of the displays. In the event that APC discontinued the product, the Support Agreement obligated APC to provide those documents to Atlantech. The 1040 MOA also exempted Defendants from liability for "consequential, incidental, indirect, special or punitive damages," including "lost profits" and "cost of replacement goods."

APC stopped producing 1040-100 displays in 2004. To obtain "form, fit, and function replacements" for the discontinued model, Atlantech purchased two hundred 1040-725 displays in February 2006 ("2006 Purchase Order"). APC did not deliver any displays under the 2006 Purchase Order. Under a separate purchase agreement, APC eventually did deliver fifteen 1040-725 displays. According to subsequent communications between Atlantech and APC, these displays did not function properly.

In April 2006, Atlantech, invoking diversity jurisdiction, see 28 U.S.C. § 1332(a), filed an action in the District Court of Massachusetts against APC for breach of contract and negligent misrepresentation. Later that year, it voluntarily dismissed the complaint. In January 2007, APC sold its assets to

-3-

APC Acquisition.   At the same time, APC, APC Acquisition, and Universal agreed among themselves not to sell any further product to Atlantech without obtaining either a release from Atlantech of all liability or the written consent of the three parties to the agreement.  Over the course of 2008 and 2009, APC Acquisition, in violation of the 1040 MOA, sold sixteen display units to a third-party vendor, knowing that it intended to develop business with UIMDB.

## II. PROCEDURAL HISTORY

This case has followed a convoluted course, and in order to place the parties' arguments in context it is necessary to trace its procedural path in some detail.  On February 21, 2007, Atlantech filed a complaint against Defendants alleging breach of warranty, breach of the 1040 MOA, breach of the 2006 Purchase Order, and negligent misrepresentation.  After two amendments to the complaint, the parties filed cross-motions for summary judgment. Judge Tauro, in an order dated March 24, 2008 ("March 2008 Order"), granted partial summary judgment in favor of Atlantech.  While that order decided a number of issues, it left others unresolved.  Among the issues it addressed, Judge Tauro held that APC was "in breach of its obligations under the Data Warehouse Documents provision" and granted injunctive relief to Atlantech requiring that APC provide it with the 1040-100 Data Warehouse Documents.

-4-

Despite the presence of unresolved issues, Judge Tauro entered judgment in favor of Atlantech, effectively closing the case. A series of motions to reopen and appeals followed, culminating in this court's order dated May 19, 2010 ("May 2010 Order"), which left in place the injunctive relief related to the Data Warehouse Documents and otherwise vacated the March 2008 Order.

On remand, the case was reassigned to Judge Woodlock. Two further amendments to the complaint followed. Atlantech filed the final version, the Fourth Amended Complaint, on June 1, 2011, alleging seven counts: Breach of Contract — Warranty (1040 MOA, 1040-72X MOA, and 890 MOA)[1] (Count I); Breach of Contract — Support and Product Availability (1040 MOA, 1040-72X MOA, 890 MOA, and Purchase Order #40323) (Count II); Breach of Contract — Data Warehouse Documents (1040 MOA, 1040-72X MOA, and 890 MOA) (Count III); Breach of Contract — 2006 Purchase Order (Count IV); Negligent Misrepresentation (Count V); Intentional Interference with Contractual Relations (Count VI); and Breach of Contract — NCA (Count VII). Thereafter, the district court resolved pending cross-motions for summary judgment and ruled in favor of Defendants on Counts III, V, and VI.

An eight-day jury trial began June 13, 2011. On the

---

[1] The 1040-72X MOA and 890 MOA are not directly at issue on appeal.

seventh trial day, the court determined that it would be expeditious for the jury to resolve a set of preliminary questions while the court heard arguments regarding directed verdict motions. The judge conferred extensively with trial counsel at that point to fashion three questions for an "interim verdict slip." On the morning of the eighth day the court instructed the jury on those preliminary questions and sent them to deliberate while the court dealt with the directed verdict motions.

Eventually, the judge indicated that he would grant a directed verdict in favor of Defendants on Counts I, V, and VI, and portions of Count II involving a purchase order that is not at issue on this appeal. He also explained that he was "keeping alive the Count III to resolve on the papers and the evidence that is presented here."[2] The judge also engaged trial counsel in an extensive discussion of what additional questions remained for the jury to decide.

Thereafter the jury was given a second verdict slip with questions regarding damages under Count IV, breach of the 2006 Purchase Order, and Count VII, breach of the NCA. On these counts, the jury awarded Atlantech $1,112,476 in damages.

---

[2] According to the record, Judge Woodlock had already resolved Counts III, V, and VI on summary judgment prior to trial. His reason for revisiting those counts after trial is not readily apparent in the transcript. None of those counts is presently before us on appeal, however, so the timing of their resolution need not concern us.

After dismissing the jury, the court instructed the parties to file a joint status report delineating the issues that remained to be resolved post-trial. The parties filed their report on July 8, 2011, and Atlantech subsequently filed a motion for judgment as a matter of law on Defendants' alleged breach of the 1040 MOA Support Agreement (an unresolved issue remaining under Count II). The court denied that motion and ordered the parties to "frame this case for final resolution by means of summary judgment motions in the wake of trial and the record as it existed as of trial."

On May 23, 2012, Atlantech filed a motion for summary judgment seeking damages for breach of the Support Agreement, prejudgment interest on all claims, and attorney's fees. Defendants filed motions for a directed verdict or, in the alternative, for judgment notwithstanding the verdict, asking the court to construe the Support Agreement in their favor and seeking a reduction in the jury's award of damages for breach of the 2006 Purchase Agreement. On March 6, 2013, the court found that Defendants were not liable for breach of the Support Agreement, denied prejudgment interest, awarded Atlantech $26,761.58 in fees and expenses, and upheld the jury's award of damages for breach of the 2006 Purchase Agreement ("March 2013 Order"). The parties appeal from the district court's March 2013 Order.

III. ANALYSIS

Before us on appeal are three broad issues: (1) whether Defendants are liable to Atlantech for damages under the terms of the 1040 MOA Support Agreement; (2) whether Atlantech is entitled to prejudgment interest; and (3) whether the district court erred in upholding the jury award of damages for breach of the 2006 Purchase Agreement.[3]

## A.        1040 MOA Support Agreement

In section 11.2 of the Support Agreement, entitled "Length of Product Availability," APC agreed "to support original product through December 31, 2012.  At that point the product may be discontinued."  The district court held that this provision was an enforceable agreement obligating Defendants "to hold open the opportunity for Atlantech to buy form, fit, and function replacements" for the 1040-100 displays for a period of ten years.

Nevertheless, the district court entered judgment in favor of Defendants on this claim.  Proceeding under a theory of anticipatory repudiation, Atlantech argued that Defendants breached the Support Agreement by agreeing in January 2007 to discontinue sales to Atlantech, unless Atlantech provided them with a release from liability or they all consented.  A claim for anticipatory repudiation requires an absolute and unqualified refusal to perform

---

[3] The parties initially disputed the award of fees and expenses, but settled that issue after oral argument.

a contract.  <u>Textile Rubber & Chem. Co.</u>, v. <u>Thermo-Flex Techs., Inc.</u>, 687 S.E.2d 919, 922 (Ga. Ct. App. 2009).[4]  The district court found that "there [was] nothing absolute or unqualified about" the Defendants' refusal to perform under the contract, because they could have all consented to continue sales.  Accordingly, it found no breach of the agreement as a matter of law.  The district court also found that Atlantech could not prove the damages it sought, which were based on lost profits as a measure of direct damages. The court held that "[t]here is nothing inherent in the bargain . . . sufficient to provide reliable numbers, and this precludes Atlantech from recovering lost profits."

On appeal, the parties dispute numerous issues with respect to the alleged breach of the Support Agreement: whether the mandate rule requires judgment in favor of Atlantech, whether the Support Agreement is an enforceable contract, the nature and scope of Defendants' obligations under the Support Agreement, whether Defendants repudiated or otherwise breached the Support Agreement, and whether Atlantech can prove direct damages related to the alleged repudiation. We can quickly dispense with Atlantech's argument for the application of the mandate rule. Of the remaining

---

[4] "Both sides premise their arguments on Georgia law, which the parties reasonably understand to govern their relationship in this regard." <u>Atlantech Inc.</u> v. <u>Am. Panel Corp.</u>, No. 07-cv-10342, 2013 WL 870227, at *8 (D. Mass. Mar. 6, 2013).  Like the district court, we accept the parties' reasonable understanding and look to Georgia law for the substantive rules of decision. <u>See</u> <u>Shay</u> v. <u>Walters</u>, 702 F.3d 76, 79–80 (1st Cir. 2012).

arguments, only one requires our attention at this stage.  We agree with the district court that Atlantech did not prove direct damages resulting from the alleged repudiation, and that the plain terms of the contract preclude recovery for other types of damages. Therefore the claim fails as a matter of law.  Because this issue is dispositive, we need not resolve the other disputes related to the Support Agreement.

1.      *Mandate Rule*

"[A]n appellate court's mandate controls all issues that were actually considered and decided by the appellate court, or as were necessarily inferred from the disposition on appeal." <u>Kashner Davidson Sec. Corp.</u> v. <u>Mscisz</u>, 601 F.3d 19, 23-24 (1st Cir. 2010) (quoting <u>NLRB</u> v. <u>Goodless Bros. Elec. Co.</u>, 285 F.3d 102, 107 (1st Cir. 2002)) (internal quotation marks omitted).  "[I]ssues that were not decided by the appellate court . . . are not affected by the mandate." <u>Id.</u> (quoting <u>de Jesús–Mangual</u> v. <u>Rodríguez</u>, 383 F.3d 1, 6 (1st Cir. 2004)) (alteration in original).

Atlantech argues that Judge Tauro's March 2008 Order held that APC breached the Support Agreement, and that this court subsequently affirmed that holding.  But this court's May 2010 Order expressly vacated the March 2008 Order in part, leaving in place only the injunction related to the Data Warehouse Documents. All that can be "necessarily inferred" from the May 2010 Order is that Defendants breached the provision of the Support Agreement

-10-

requiring them to turn over the Data Warehouse Documents. The May 2010 Order did not decide the question currently before us; whether Defendants breached section 11.2 of the Support Agreement. Therefore, the mandate rule does not apply.

2.        *Damages*

In a breach of contract case, "the burden is on the plaintiff to show both the breach and the damage." <u>Adamson Co.</u> v. <u>Owens-Ill. Dev. Corp.</u>, 309 S.E.2d 913, 916 (Ga. Ct. App. 1983). Atlantech does not dispute that it contractually waived the right to seek consequential damages, including lost profits. It argues, however, that lost profits can serve as a measure of direct damages. It also offers two alternate measures of damages.

At trial, Atlantech attempted to prove lost profits by showing past sales to UIMDB as well as evidence of UIMDB's intent to buy certain quantities in the future. It relied on the prices at which it bought and sold the displays at the time the parties entered into the 1040 MOA. But as the district court observed, the Support Agreement itself does not prescribe any particular price or quantity for future sales, other than providing that prices must be "in line" with those from past sales. Under these circumstances the district court found the evidence offered by Atlantech too speculative, because "[t]here is nothing inherent in the bargain when the parties entered into the 1040 MOA in 2003 sufficient to provide reliable numbers." We agree with the district court.

Under Georgia law, the term "lost profits" refers to two distinct concepts:

> Consequential damages, which may include 'profits which might accrue collaterally as a result of the contract's performance,' are a separate concept from direct damages, which may include 'profits necessarily inherent in the contract.' Thus there are two types of lost profits: (1) lost profits which are direct damages and represent the benefit of the bargain (such as a general contractor suing for the remainder of the contract price less his saved expenses), and (2) lost profits which are indirect or consequential damages such as what the user of the MRI would lose if the machine were not working and he was unable to perform diagnostic services for several patients.

Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc., 490 S.E.2d 124, 127 (Ga. Ct. App. 1997) (internal citation omitted). Another court observed that profits "necessarily inherent in the contract . . . are always provable." Franklin v. Demico, Inc., 347 S.E.2d 718, 721 (Ga. Ct. App. 1986).

The question here is whether the damages Atlantech seeks to prove are "necessarily inherent in the contract." We find that they are not, because they depend on contingencies beyond the terms of the contract itself. The brief examples offered by the court in Imaging Systems are instructive. When a general contractor sues for its remaining contract price less saved expenses, the damages do not depend on the future action of any third party; they are determined by the terms of the contract and the circumstances of the breach. Thus, they are "always provable" in the sense that they do not require evidence of what some other party might have

-12-

done. The damages suffered by the doctor with a malfunctioning MRI machine depend on how many patients one might have seen if the machine were working. The doctor very well might be able to recover such damages by showing evidence of how many patients were normally seen in the past, but they would remain consequential damages.

Other circuits have reached a similar understanding of the distinction between the two types of lost profits:

> Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract. Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages. Thus, for example, if a services contract is breached and the plaintiff anticipated a profit under the contract, those profits would be recoverable as a component of direct, benefit of the bargain damages. If that same breach had the knock-on effect of causing the plaintiff to close its doors, precluding it from performing other work for which it had contracted and from which it expected to make a profit, those lost profits might be recovered as "consequential" to the breach.

Atl. City Assocs., LLC, v. Carter & Burgess Consultants, Inc., 453 F. App'x 174, 179-80 (3d Cir. 2011) (quoting Penncro Assocs., Inc. v. Sprint Spectrum, L.P., 499 F.3d 1151, 1156 (10th Cir. 2007)).

The evidence that Atlantech offered at trial is relevant to lost profits as consequential, not direct, damages. Atlantech is seeking to show how much it would have earned selling displays to UIMDB if APC had performed its obligations under the Support Agreement. Because those damages rely on future deals with a

-13-

business that is not a party to the Support Agreement, and are contingent on anticipated prices and demand that are not determined by the contract itself, the damages are not "necessarily inherent in the contract." Thus, they are consequential damages, for which Defendants are not liable under the terms of the 1040 MOA.

Atlantech fares no better with its other theories of damages. It argues that "under Georgia law, Atlantech may recover direct damages in an amount equal to the difference between the market price at the time the buyer learned of the breach and the contract price, less expenses saved at as a result of the breach." The obvious problem with the use of this method of measuring damages here is that there is no contract price in section 11.2 of the Support Agreement. Presumably, if APC had continued to sell displays to Atlantech under the terms of the Support Agreement, the parties would have negotiated a price for each sale. Without a fixed contract price, Atlantech cannot use this method to prove damages.

Finally, Atlantech argues that it "is entitled to recover its attempted mitigation expenses associated with Defendants' repudiation of their support obligations." Atlantech defines its "mitigation expenses" as its "failed efforts to develop a substitute for the 1040-100 Display." But the terms of the 1040 MOA clearly exempt Defendants from liability for the "cost of replacement goods." Therefore, Atlantech is barred from recovering

-14-

damages under this theory as well.

In sum, the district court correctly concluded that Atlantech had failed to prove damages for breach of the Support Agreement and thus finding for Defendants on that claim.

**B.        Prejudgment Interest**

In its post-trial motion, Atlantech asked the district court to award prejudgment interest. Georgia law provides for a discretionary award of prejudgment interest on unliquidated claims, Ga. Code Ann. § 13-6-13,[5] but it is the role of the jury, not the court, to exercise that discretion. See Alphamed, Inc. v. B. Braun Med., Inc., 367 F.3d 1280, 1287 (11th Cir. 2004) (applying Georgia law); Am. Family Life Assurance Co. of Columbus, Ga. v. U.S. Fire Co., 885 F.2d 826, 835–36 (11th Cir. 1989).

Atlantech did not submit a request for prejudgment interest to the jury at trial. Therefore the court found the issue to be waived and denied the request. On appeal, Atlantech argues that it did not knowingly waive the request, because "the district court bifurcated the case in the middle of trial and allowed only certain issues to go to the jury." According to Atlantech, when the district court bifurcated the case, it represented that it would impanel a second jury at a later time to determine outstanding factual issues.

---

[5] "[T]he parties agree that the request is one for interest on unliquidated damages. . . . " Atlantech, 2013 WL 870227, at *8.

-15-

The record belies Atlantech's argument. The court only "bifurcated" the trial in the sense that it sent three preliminary questions to the jury while the court heard arguments about issues pertaining to the directed verdict requests. While the jury deliberated the questions submitted to it, the court repeatedly asked counsel to articulate which issues remained for the jury and which could be decided as a matter of law. ("My touchstone is what else am I going to do with this jury at this time, . . . I am trying to figure out what else I am going to ask them."); ("I am searching through to identify those factual disputes that can be resolved in a way that I am comfortable with by this jury."); ("But let me just see if I can get through all of this to see what else is potentially left that requires jury determination . . . ."); ("So, I would like you to be thinking about, again, what else we would want from this particular jury.")

Thus, prior to submitting a second (and final) verdict form to the jury, the court expressly gave the parties multiple opportunities to identify any issues they believed the jury needed to decide. Under these circumstances, there is no legitimate reason for Atlantech's failure even to mention the issue of prejudgment interest at that time, and thus the district court did not err in its holding that Atlantech had waived the issue.

## C.        2006 Purchase Agreement

Under the 2006 Purchase Agreement, Atlantech ordered 200[6] 1040-725 displays from APC for $1,335,750 in order to fulfill an agreement it reached with UIMDB in December 2005.  APC guaranteed that the 1040-725 model would be "form, fit and function" compatible with the displays Atlantech purchased previously.  APC was to deliver twenty-five units by April 15, 2006, and place the "[r]emaining 175 unit materials on hold until confirmation of compatibility."  As discussed above, APC did not deliver any displays under the 2006 Purchase Agreement, but did deliver fifteen displays under a separate agreement.  Those fifteen displays apparently did not function properly, and Atlantech never gave APC a confirmation of compatibility.

At trial, the jury awarded Atlantech $1,070,456 in damages on Count IV, based on the value of the UIMDB contract minus the cost of the 2006 Purchase Agreement, the cost of sale, and the amount Atlantech received for separately delivering the fifteen displays it received from APC.  In their post-trial motion, Defendants asked the district court to reduce the damages to $57,862.67, which would represent the lost profits on the twenty-five displays that APC was supposed to deliver by April 15, 2006, minus the profits Atlantech received on the fifteen that APC

[6] There is a discrepancy in the order, which appears to be for 201 displays but only requires delivery of 200.  At trial, Atlantech sought damages based on the 200 units to be delivered.

-17-

delivered separately.  According to Defendants, they were only obligated to deliver twenty-five displays until Atlantech gave them a confirmation of compatibility; the fact that Atlantech never confirmed compatibility absolved them of the obligation to deliver the remaining 175 units.

The district court rejected Defendants' reading of the contract. It read the confirmation provision as a protection for Defendants "against a situation in which they produced the full number of displays (thus bearing the cost of production for a full 200 displays), and then also faced liability for breach if all those displays turned out to be incompatible with 1040-100 units." It concluded that "nothing indicates that a failure to provide a confirmation of compatibility relieved APC of its obligation to deliver" the full order of 200 displays, particularly in light of Defendants' "fail[ure] to deliver even the initial round of compatible displays."

The district court's reading of the contract is correct. Defendants have not offered any arguments on appeal that persuade us otherwise.  They ask us to read the confirmation provision as a condition precedent to full delivery, but that is not the ordinary meaning of the contractual language. The phrase "on hold," which commonly indicates a _temporary_ delay,[7] implies the expectation of

_____

[7] See _Random House Dictionary of the English Language_ 911 (2d. ed. 1987) (defining "on hold" as "in or into a temporary state of interruption or suspension").

-18-

eventual completion.  In that respect it is different from the type of language that would more commonly indicate a condition precedent, such as "subject to" or "if and only if."  The 2006 Purchase Agreement was for 200 displays.  The fact that the parties had the foresight to test the compatibility of a few displays prior to delivery of the entire order does not evince an intention to truncate Defendants' obligation under the contract.  Accordingly, we hold that the district court did not err in upholding the jury's award of damages.

## IV. CONCLUSION

For the reasons explained above, we **AFFIRM** the district court's orders.  All parties shall bear their own costs.