**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SOLIDFX, LLC,

    Plaintiff - Appellee/Cross-Appellant,

v.

JEPPESEN SANDERSON, INC.,

    Defendant - Appellant/Cross-Appellee.

Nos. 15-1079
and 15-1097

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:11-CV-01468-WJM-BNB)**
_____

Craig S. Primis, P.C. (John C. O'Quinn, Michael A. Glick, Jason M. Wilcox, and Jennifer M. Bandy, with him on the briefs), Kirkland & Ellis LLP, Washington, District of Columbia, for Defendant-Appellant.

Shannon Wells Stevenson (Kenzo Kawanabe, Benjamin B. Strawn, and Emily L. Wasserman with her on the briefs), Davis Graham & Stubbs LLP, Denver, Colorado, for Plaintiff-Appellee.
_____

Before **KELLY**, **McKAY**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

    This case involves a dispute between SOLIDFX, LLC, a software development company, and Jeppesen Sanderson, Inc., a subsidiary of Boeing that develops aviation terminal charts. SOLIDFX sued Jeppesen, asserting antitrust, breach-of-contract, and tort

claims. The district court granted partial summary judgment on the antitrust claims, but the remaining claims proceeded to trial. The jury found in favor of SOLIDFX and awarded damages in excess of $43 million.

Jeppesen now appeals, challenging only the district court's ruling that SOLIDFX could recover lost profits on its contract claims. SOLIDFX cross-appeals the district court's summary judgment order in favor of Jeppesen on the antitrust claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and vacate the jury's award of lost profits, but we affirm the partial summary judgment on SOLIDFX's antitrust claims.

## I.    BACKGROUND

### A.  *Factual History*

Jeppesen creates terminal charts, which provide pilots with the information necessary to navigate and land at a specific airport. Jeppesen gathers information from over 220 countries, creates its charts, updates them periodically, and then sells the charts and updates to customers. Jeppesen holds copyrights for portions of its charts, which use a proprietary format, including unique symbology, colors, fonts, and layout. Historically, pilots used paper terminal charts, but demand has risen for electronic alternatives to the bulkier hard-copy versions.

In November 2008, Jeppesen contacted SOLIDFX to discuss options for making Jeppesen's terminal charts available for electronic viewing. SOLIDFX suggested using an e-reader device known as the iRex and demonstrated a prototype to Jeppesen. The parties then began negotiating a License and Cooperation Agreement ("License Agreement") under which Jeppesen would waive its standard licensing fee and grant SOLIDFX access to

2

Jeppesen Integration Toolkits, which are proprietary products that facilitate the integration of Jeppesen's terminal charts into third-party systems. In exchange, SOLIDFX would create a "data management reader solution that works in conjunction with an e-book viewer, as modified to access, utilize and display Jeppesen Data."

In July 2009, before the License Agreement had been finalized, Jeppesen began providing toolkits to SOLIDFX and SOLIDFX began selling iRex devices "embedded with [SOLIDFX's] software and pre-loaded with Jeppesen's charts." The parties then finalized and executed the License Agreement on December 31, 2009.

In January 2010, Apple, Inc. announced the first version of its iPad product. Shortly after the announcement, SOLIDFX registered with Apple as a software application (app) developer and requested the necessary toolkit from Jeppesen to develop an iPad app. Jeppesen did not provide the toolkit. Rather, in May 2010, Jeppesen announced it had created its own iPad app, which it offered to its customers at no additional cost beyond their terminal chart subscription fee.

## B. *Procedural History*

Upon learning Jeppesen had developed its own iPad app, SOLIDFX sued Jeppesen for antitrust violations, breach of contract, and various torts. The district court granted summary judgment for Jeppesen on the antitrust claims but denied summary judgment on the remaining claims. In particular, the district court rejected Jeppesen's argument that the License Agreement precluded the recovery of lost profits. The court instead concluded the agreement was ambiguous as to whether all lost profits were barred and indicated it would be up to the jury to decide what types of damages the parties intended to exclude.

3

During trial, both parties moved for a legal determination on the recoverability of lost profits under the License Agreement. The district court reconsidered its prior ruling and concluded the License Agreement excluded only lost profits that also qualified as consequential damages. As a result, it held that lost profits falling within the definition of direct damages could be recovered. The district court further determined that lost profits from two of SOLIDFX's apps qualified as direct damages, while lost profits from two other apps were properly classified as consequential damages.[1]

After an eight-day trial, the jury found for SOLIDFX on all claims and awarded it $43,096,003 in damages. The award included $20,922,500 in lost profits from SOLIDFX's projected iPad app sales during the initial term of the contract; $21,385,500 for lost business value assuming the parties would have allowed the License Agreement to renew for an additional five years; $615,000 for lost profits attributable to Jeppesen's refusal to provide a toolkit for tailored terminal charts for the iRex device; $1 for breach of the duty of good faith and fair dealing; $173,000 for fraudulent misrepresentation;[2] $1 for fraudulent concealment; and $1 for intentional interference with business relations.

---

[1] SOLIDFX's FXView HD app would have displayed basic terminal charts on the iPad, and its FXView Enterprise app would have done the same while also providing document management and audit capabilities. Because these apps would have utilized Jeppesen's charts, the district court concluded lost profits from these apps were direct damages. By contrast, SOLIDFX's FX Maintain and FX Mobile apps did not use Jeppesen's charts at all. FX Maintain was an app for aviation mechanics, flight attendants, and other non-pilots in the industry. And FX Mobile was a document management app for non-aviation businesses. The district court concluded lost profits from these apps were "classic examples of consequential damages."

[2] The district court vacated the portion of the jury's verdict awarding damages for fraudulent misrepresentation. SOLIDFX does not appeal that ruling.

Jeppesen now appeals but challenges only the district court's ruling permitting

SOLIDFX to recover lost profits. SOLIDFX has filed a cross-appeal in which it contends

the district court erred in granting summary judgment in favor of Jeppesen on the antitrust

claims. We conclude the License Agreement unambiguously precludes the recovery of lost

profits, irrespective of whether they are direct or consequential damages. But we also

determine that, even if the agreement could be read to allow the recovery of direct lost

profits, the lost profits awarded by the jury here are consequential damages and therefore

not recoverable. Because we hold that SOLIDFX was contractually precluded from

recovering the amounts awarded for lost profits, we do not reach the question of whether

SOLIDFX proved those lost profits with reasonable certainty, nor do we address the

admissibility of expert testimony offered by SOLIDFX to establish the amount of its lost

profits. Finally, we agree with the district court that Jeppesen was entitled to summary

judgment on SOLIDFX's antitrust claims.

## II.   DISCUSSION[3]

Jeppesen asserts several bases to reverse and vacate the portions of the jury's award

that include lost profits. First, Jeppesen argues the district court incorrectly interpreted the

---

[3] As a preliminary issue, SOLIDFX requests that we summarily affirm on all issues because Jeppesen failed to provide a complete appendix. Although "[a]n appellant who provides an inadequate record does so at his peril," *Dikeman v. Nat'l Educators, Inc.*, 81 F.3d 949, 955 (10th Cir. 1996), the appendices in this case allow for full review of the issues on appeal. To the extent Jeppesen's initial appendix may have been lacking, SOLIDFX filed a sizeable supplemental appendix, as did Jeppesen. These supplements complied with our local rules, which permit supplementation if a party finds omissions in the appendix. 10th Cir. R. 30.2(A)(1). In addition, SOLIDFX has not identified specific deficiencies in the appendices that create "an effective barrier to informed, substantive appellate review." *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1238 (10th Cir. 1999). Accordingly, we conclude the appendices are sufficient and proceed to the merits.

5

License Agreement to allow recovery of any lost profits. This involves "[t]he proper construction of a contract," which "is a question of law we review *de novo*." *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155 (10th Cir. 2007). Second, Jeppesen contends that even if the district court was correct that the License Agreement permitted the recovery of direct lost profits, the lost profits awarded by the jury here are consequential damages. The proper classification of the damages as direct or consequential is a question of law we review de novo. *See Int'l Tech. Instruments, Inc. v. Eng'g Measurements Co.*, 678 P.2d 558, 561 (Colo. App. 1983), *superseded by statute on other grounds as recognized in Colo. Dep't of Soc. Servs. v. Bethesda Care Ctr., Inc.*, 867 P.2d 4 (Colo. App. 1993). In its cross-appeal, SOLIDFX challenges the district court's grant of partial summary judgment on its antitrust claims, which is a decision we also review de novo. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

## A. *Lost Profits*

The parties disagree on whether the License Agreement prohibits entirely the recovery of lost profits. Under Colorado law,[4] "[w]e must construe the terms of the agreement in a manner that allows each party to receive the benefit of the bargain, and the scope of the agreement must faithfully reflect the reasonable expectations of the parties." *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003). We begin first by examining the plain language of the contract. *Id.* In doing so, "[w]e will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction." *Id.*

## 1. Plain Language of the License Agreement

The relevant contractual language reads as follows:

> **8.2** **EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES:** **EXCEPT TO THE EXTENT OF THE INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 9, NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER, WHETHER ARISING IN CONTRACT (INCLUDING WARRANTY), TORT (WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF EITHER PARTY), STRICT LIABILITY OR OTHERWISE,**
>
> **8.2.1** **FOR LOSS OF USE, REVENUE OR PROFIT; OR**
>
> **8.2.2** **FOR ANY OTHER INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE, OR OTHER DAMAGES WITH RESPECT TO THE JEPPESEN DATA, THE JIT, AND OTHER PRODUCTS AND SERVICES PROVIDED HEREUNDER; AND**

---

[4] The parties agree Colorado law applies in this case.

**8.2.3 ANY NONCONFORMANCE OR DEFECT IN THE JEPPESEN DATA, THE JIT, OR OTHER THINGS PROVIDED UNDER THIS AGREEMENT.**

Section 8.2 begins with the heading "**EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES**," which plainly indicates that the section will identify the damages the parties agreed to exclude from the available remedies for breach, including consequential damages, and other types of damages.

Next, Section 8.2 broadly proclaims that neither party will be liable to any extent whatsoever for the categories of damages then identified in three separately numbered paragraphs. First, in Subsection 8.2.1, the parties agreed to exclude damages "**FOR LOSS OF USE, REVENUE, OR PROFIT**." Together, Section 8.2 and Subsection 8.2.1 provide, "[**N**]**EITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER, . . . FOR LOSS OF USE, REVENUE, OR PROFIT**." Read plainly, this language imposes an unqualified bar that prohibits either party from recovering lost profits from the other.

According to SOLIDFX, however, Subsection 8.2.1 cannot be read as a free-standing provision. Instead, SOLIDFX contends that Subsections 8.2.1 and 8.2.2 "are clearly linked to each other by the words 'or for any other,'" and "[t]his syntax makes clear that the damages listed in 8.2.1 are not stand-alone categories of damages, but are merely examples that fall within the larger categories listed in 8.2.2, such as indirect or consequential damages." That is, SOLIDFX reads Subsection 8.2.2 as qualifying the damages prohibited by the list in Subsection 8.2.1. Although we agree that the subsections share an introductory

8

paragraph and are related in purpose, we do not agree that Subsection 8.2.2 qualifies Subsection 8.2.1.

SOLIDFX's interpretation ignores the structure of Section 8.2, including the use of semicolons, separate paragraph numbers, and indentation, which evidence the intent to treat Subsection 8.2.1 as a separate category of damages from those in Subsections 8.2.2 or 8.2.3. The phrase "**FOR ANY OTHER**" appears in Subsection 8.2.2 and does not purport to limit the effect of Subsection 8.2.1 either expressly or by reference.

Rather, the subsections of Section 8.2 provide three different types of excluded damages. First, the parties agreed to exclude damages for loss of use, revenue, or profit, and did so without express limitation. Second, in Subsection 8.2.2, the parties listed additional categories of excluded damages: "**ANY OTHER INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE, OR OTHER DAMAGES WITH RESPECT TO THE JEPPESEN DATA, THE JIT, AND OTHER PRODUCTS AND SERVICES HEREUNDER**." Thus, Subsection 8.2.2 indicates that damages *other than* those that were previously excluded in Subsection 8.2.1 for loss of use, revenue, or profit are here excluded, and the specific categories now excluded are indirect, incidental, consequential, special, exemplary, punitive, or other damages. But unlike Subsection 8.2.1's comprehensive bar to the recovery of lost profits, the damages identified in Subsection 8.2.2 are only excluded "**WITH RESPECT TO THE JEPPESEN DATA, JIT, AND OTHER PRODUCTS AND SERVICES PROVIDED**" under the License Agreement. Finally, in Subsection 8.2.3, the parties barred the recovery of damages for "**ANY NONCONFORMANCE OR DEFECT IN THE JEPPESEN DATA, THE JIT,**

**OR OTHER THINGS PROVIDED UNDER THIS AGREEMENT.**" Again, this subsection plainly excludes a separate category of damages than those identified in Subsections 8.2.1 and 8.2.2.

Within Section 8.2, where the parties intended to limit the effect of a subsection's exclusion of identified damages, that limitation is stated in the subsection itself. For example, in Subsection 8.2.2, the parties limited the exclusion to the listed damages but only "**WITH RESPECT TO**" the products and services provided in the License Agreement. And rather than assume that same restriction would carry over into the separately-numbered Subsection 8.2.3, the parties explicitly reiterated the same limitation on the exclusion of defect and nonconformance damages, "**IN THE JEPPESEN DATA, THE JIT, OR OTHER THINGS PROVIDED UNDER THIS AGREEMENT**." The insertion of this limitation separately in both Subsections 8.2.2 and 8.2.3 belies SOLIDFX's argument that the separately-numbered sections modify one another.

Similarly, when the parties intended to refer to consequential damages, they did so expressly. As previously noted, the underlined phrase at the beginning of Section 8.2 announces the intent to exclude "consequential and other damages." Likewise, Subsection 8.2.2 plainly excludes indirect, incidental, and consequential damages. But the parties did not use the term "consequential" to modify or limit the exclusion of lost profits in Subsection 8.2.1 or to limit the exclusion of defect or nonconformity damages in Subsection 8.2.3. This omission indicates the intent to bar all lost profit damages without limitation, and to exclude all damages for defect or nonconformity in things provided under the License Agreement. "When a contract uses different language in proximate and similar provisions,

we commonly understand the provisions to illuminate one another and assume that the parties' use of different language was intended to convey different meanings." *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156–57 (10th Cir. 2007). Here, the absence of the word "consequential" from Subsections 8.2.1 and 8.2.3, while using it in Section 8.2 and Subsection 8.2.2, evidences the intent to bar both direct and consequential lost profits and direct and consequential damages for defect or nonconformity.

SOLIDFX argues, however, that our decision in *Penncro* mandates a reading of Subsection 8.2.1 that limits the exclusion to consequential lost profits. To the contrary, *Penncro* supports our conclusion that Subsection 8.2.1 precludes the recovery of all lost profit damages whether direct or consequential in nature. There, the relevant provision "forb[ade] the recovery of 'consequential damages,' specifying that they 'include, but are not limited to, lost profits, lost revenues and lost business opportunities.'" *Id.* at 1155–56. The district court held that use of the term "consequential damages" followed by a list of examples "forb[ade] only 'consequential' or 'indirect' damages" and did "nothing to rule out of bounds lost profits suffered as a direct consequence of [the defendant's] breach." *Id.* On appeal, the defendant challenged that ruling, arguing the contract language prohibited the recovery of all lost profits. *Id.* We disagreed and explained that the provision's "syntax alone propels us in this direction." *Id.* at 1156. Specifically, we concluded that the "more general term" used in the contract—consequential damages— "inform[ed] the subsequently listed examples," and thereby limited the excluded lost profit damages to those that also fall within the general category of consequential damages. *Id.* In reaching that conclusion, we distinguished cases involving contracts where "lost profits were not . . . placed in an

11

illustrative list of the sorts of consequential damages excluded; instead, they were singled out as a separate and distinct category of forbidden damages." *Id.* at 1157. And we cited such cases as examples of "how parties easily can manifest an intent to preclude lost profits of any stripe." *Id.* at 1157–58 & n.8 (citing *Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124, 127 (Ga. Ct. App. 1997) (lost profits set off from consequential damages by disjunctive "or")). Because the parties in *Penncro* listed lost profits as an example of a type of consequential damages, we held the contract excluded only consequential lost profits. *Id.* at 1162.

Here, the License Agreement models the syntax and structure we recognized in *Penncro* as excluding lost profits of any stripe. Section 8.2 does not generally exclude consequential damages and then include lost profits as an example of such consequential damages. Rather, Subsection 8.2.1 simply and without limitation states that "**NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER** . . . **FOR LOSS OF** . . . **PROFIT**." In addition, Subsection 8.2.1 ends with a semicolon followed by the disjunctive "or," after which Subsection 8.2.2 lists other distinct types of damages foreclosed by the contract, including consequential damages. When interpreting similar language—two clauses separated by a semicolon and "or"—the Supreme Court and Colorado courts have held the clauses should be read separately. *See, e.g.*, *United States v. Republic Steel Corp.*, 362 U.S. 482, 486 (1960) (provisions found to be separate and distinct where separated by a semicolon); *People v. Valenzuela*, 216 P.3d 588, 591 (Colo. 2009) (clauses "offset by the word 'or' and semicolons" defined "separate ways in which an individual can violate that category, and therefore commit the offense"); *People v. Boling*,

12

261 P.3d 503, 506 (Colo. App. 2011) ("Each provision is different and is separated from the others by a semicolon and the disjunctive word 'or,' which is ordinarily assumed to demarcate different categories."). We reach the same conclusion here.

Rather than interpreting the "any other" language in Subsection 8.2.2 as a limitation on Subsection 8.2.1, the language is more appropriately read as indicating that, if there are any indirect, incidental, consequential, special, exemplary, or punitive damages not already excluded by Subsection 8.2.1, they are now excluded by Subsection 8.2.2, at least to the extent they are "with respect to" the services and products provided under the License Agreement. This interpretation gives meaning to the structure of Section 8.2 and to use of the term "consequential" in Section 8.2 and Subsection 8.2.2 but not in Subsections 8.2.1 and 8.2.3.

The district court reached a contrary result primarily due to its concern that the Licensing Agreement "does not contemplate that [Jeppesen] is paying [SOLIDFX] any money for its services in developing the 'System'. Thus, the only benefit to [SOLIDFX] in entering into the Agreement is the profits which [it] could receive for sale of its 'Systems'." Similarly, SOLIDFX maintains that enforcing Subsection 8.2.1 as written would defeat the purpose of the Licensing Agreement by eliminating the ability for a party to be made whole.

But it is not the business of the courts to draft a better contract for the parties than they did for themselves. *See Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 820 (Colo. 2002) ("[C]lear and unambiguous provisions cannot simply be rewritten by the courts"); *Kansas City Life Ins. Co. v. Pettit*, 61 P.2d 1027, 1028 (Colo. 1936) ("It is elementary that neither this court nor any other court can make a new contract in lieu of the one originally entered

13

into by the parties themselves."). "The intent of the parties to a contract is to be determined primarily from the language of the instrument itself." *Ad Two, Inc. v. City & Cty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000). As discussed, Subsection 8.2.1 unambiguously establishes the parties' intent to preclude recovery by either party of *any* lost profits.

Furthermore, "[a]s a general rule, courts will uphold an exculpatory provision in a contract between two established and sophisticated business entities that have negotiated their agreement at arm's length." *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191 (Colo. App. 2008); *see also CompuSpa, Inc. v. Int'l Bus. Machs. Corp.*, 228 F. Supp. 2d 613, 626–27 (D. Md. 2002) ("[T]here is no public policy against enforcement of limited liability clauses for abandonment of a contractual obligation, even if deliberate."). Even if the relevant contract provision "may severely if not completely restrict [a party's] ability to recover for [the relevant] breach of contract, parties are free to agree to such provisions." *Imaging Sys.*, 490 S.E.2d at 127. Indeed, parties to a contract "must be able to confidently allocate risks and costs during their bargaining without fear that unanticipated liability may arise in the future, effectively negating the parties' efforts to build these cost considerations into the contract." *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 871 (Colo. 2002).

Both SOLIDFX and Jeppesen agreed they would bear the risk of their own lost profits and forego other damages as identified in Section 8.2. And, in the License Agreement itself, they explained the reason for their decision to limit the damages available in the event of breach:

> **8.4**     Effect of Limitation. The parties acknowledge that the limitations set forth in this Section are integral to the amount of fees specified within this Agreement, and

14

recognize that were Jeppesen to assume any further liability beyond that set forth herein, such fees could be substantially higher.

In other words, SOLIDFX expressly waived its ability to recover several types of damages, including lost profits, and waived the warranties listed in Section 8.1.[5] But for these waivers, Jeppesen would not have waived the license fee to access its proprietary toolkits. The inclusion of this acknowledgment further supports the reading of Section 8.2.1 as meaning exactly what it says: "**NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER** . . . **FOR LOSS OF USE, REVENUE OR PROFIT**." Even if an agreement to limit only consequential lost profits would have been a better deal for SOLIDFX, it is not the bargain it made.

And this interpretation does not leave SOLIDFX without a remedy as it contends. SOLIDFX and Jeppesen both contractually waived the right to recover lost profits in Subsection 8.2.1; the damages listed in Subsection 8.2.2 with respect to the products and services *provided* under the License Agreement; and the defect and nonconformance damages described in Subsection 8.2.3. But they did not exclude reliance damages— damages incurred when products or services promised under the License Agreement were *not provided*. Such damages "includ[e] expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." Restatement (Second) of Contracts § 349; *see also Bunch v. Signal Oil & Gas Co.*, 505 P.2d 41, 43 (Colo. App. 1972) ("The fact that plaintiff failed to prove his damages concerning loss of profits will not

---

[5] Section 8.1 contains a broad disclaimer of any express or implied warranties other than those expressly contained in the License Agreement.

prevent his recovery for actual expenditures made in reasonable reliance on the performance of the contract or made because of the breach of the contract.").

Here, SOLIDFX originally claimed $173,000 in "wasted costs," which SOLIDFX's expert explained were not lost profits but were "monies that were spent by SOLIDFX because Jeppesen did not adhere to the terms of the contract." Although SOLIDFX's expert included wasted costs in her original damage calculations, SOLIDFX omitted them from the damages it sought at trial. Essentially, SOLIDFX made the tactical decision to drop its claim for the type of damages available under the License Agreement in the hope of recovering the much greater sums it claimed as lost profits. But SOLIDX was bound by the terms of the License Agreement, including the exclusion of any lost profit damages. And because it did not offer the evidence of "wasted costs" to the jury, SOLIDFX has not made a record of the damages recoverable under the License Agreement.

In summary, the Licensing Agreement unambiguously precludes either party from recovering lost profits. This reading is consistent with the structure, punctuation, and plain language of Section 8.2. Although Section 8.2 greatly limits the available damages either party can recover in the event of breach, it is not the courts' role to create or enforce a different contract than the one the parties negotiated. We must enforce the unambiguous exclusion of lost profits contained in Subsection 8.2.1. Accordingly, the verdict must be vacated to the extent it includes lost profits of any stripe.[6]

---

[6] This includes damages awarded for lost business value because the district court concluded that "calculations for lost business value [were] essentially equivalent to [the] estimate of [SOLIDFX's] future lost profits." Although SOLIDFX's expert "testified that lost business value encompasses a business'[s] goodwill and other intangibles, she made no attempt to quantify anything other than future expected revenues." Indeed, on cross-

16

## 2. Consequential Versus Direct Damages

Even if we agreed with the district court that the License Agreement excludes only consequential lost profits, we would still vacate the verdict because the lost profits alleged by SOLIDFX are consequential damages as a matter of law. To place our analysis in context, we begin with a discussion of the distinction between consequential and direct damages. We then explain why the evidence here falls within the definition of consequential damages.

Colorado follows the general rule that allows the recovery of foreseeable damages for breach of contract. *See Vanderbeek*, 50 P.3d at 871. This, in turn, includes damages for losses that "may fairly and reasonably be considered . . . arising naturally, i.e., according to the usual course of things, from [the] breach of contract itself." *Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 370 P.3d 353, 360 (Colo. App. 2016) (alterations in original) (quoting *Hadley v. Baxendale*, 9 Exch. 345, 156 Eng. Rep. 145 (1854)). The damages flowing directly from the breach are commonly referred to as general, or direct, damages. *Id.* The second category of damages available for breach of contract includes special, or consequential, damages. *Id.* Such consequential damages compensate for loss "reasonably . . . supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it," but not flowing directly from the breach. *Id.* (quoting *Hadley*, 9 Exch. at 354); s*ee also Vanderbeek*, 50 P.3d at 870–71 (approving the *Hadley* measure of damages for breach of contract).

examination, SOLIDFX's expert agreed that in projecting lost business value, she was "monetiz[ing] the future profits of SOLIDFX." Because SOLIDFX's lost business value equates to lost profits, this portion of the jury award is also vacated.

17

We have explained the difference between direct and consequential damages in the context of lost profits:

> Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract. *Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages.* Thus, for example, if a services contract is breached and the plaintiff anticipated a profit under the contract, those profits would be recoverable as a component of direct, benefit of the bargain damages. If the same breach had the knock-on effect of causing the plaintiff to close its doors, precluding it from performing other work for which it had contracted and from which it expected to make a profit, those lost profits might be recovered as "consequential" to the breach.

*Penncro*, 499 F.3d at 1156 (emphasis added). Thus, while it is true that lost profits often fall within the larger category of consequential damages, lost profits that flow directly from the breach of the contract itself are properly characterized as direct damages.

The Colorado Supreme Court has not expressly defined when lost profits qualify as consequential damages. Although it has referred to specific lost profits as consequential damages, *see, e.g.*, *W. Cities Broad., Inc. v. Schueller*, 849 P.2d 44, 49 (Colo. 1993) ("At trial, [the plaintiff] sought consequential damages, including lost profits, but did not seek out-of-pocket expenses."); *Colo. Nat'l Bank of Denver v. Friedman*, 846 P.2d 159, 174 (Colo. 1993) (affirming an award of "consequential damages for lost profits"), these cases did not raise the issue of whether the lost profits were correctly characterized as direct or consequential damages. We are convinced, however, that should that issue be placed squarely before it, the Colorado Supreme Court would recognize that lost profits can be either direct or consequential damages. And we are also confident that it would distinguish between these types of lost profits based on its ordinary rule that direct damages flow

18

directly from the breach of the contract with the breaching party, while consequential lost profits flow from losses beyond the scope of that contract.

Applying these principles, the First Circuit recently addressed the proper classification of lost profits under facts similar to those at issue here. In *Atlantech Inc. v. American Panel Corp.*, Atlantech, a dealer in aircraft LCD displays, sued its primary product suppliers for breach of contract. 743 F.3d 287, 293 (1st Cir. 2014). Atlantech was also party to a separate contract under which it was the exclusive vendor of LCD panels to UIMDB, a company that integrated Atlantech's LCD displays into aircraft instrument panels. Atlantech and its suppliers engaged in a series of disputes that resulted in the suppliers refusing to provide displays, and Atlantech sued them for breach of contract. After a jury awarded Atlantech over $1 million in damages, the defendants appealed.

One of the issues considered by the First Circuit was whether the district court had erred in upholding the jury's damage award—which was based on lost profits—in light of the contract's express exclusion of "consequential, incidental, indirect, special or punitive damages," including "lost profits." *Id.* at 289. Applying Georgia law, the appellate court first explained that lost profits can qualify as either direct or consequential damages:

> (1) lost profits which are direct damages and represent the benefit of the bargain (such as a general contractor suing for the remainder of the contract price less his saved expenses), and (2) lost profits which are indirect or consequential damages such as what the user of the MRI would lose if the machine were not working and he was unable to perform diagnostic services for several patients.

*Id.* at 293 (quoting *Imaging Sys.*, 490 S.E.2d at 127).

The court in *Atlantech* then examined the evidence of lost profits, which consisted of proof of "past sales to UIMDB as well as evidence of UIMDB's intent to buy certain

19

quantities in the future." *Id.* at 293. It concluded Atlantech's lost profits qualified as consequential damages because they were not "necessarily inherent in the contract"—i.e., they were contingent "on future deals with a business that [was] not a party to the [contract], and . . . on anticipated prices and demand that [were] not determined by the contract itself." *Id.* at 294; *see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. . . . By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages."); *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, No. 3:10 CV 2296, 2011 WL 4376123, at *3 (N.D. Ohio Sept. 20, 2011) (unpublished) (holding lost profits were barred as consequential damages because they "were contingent upon third-party agreements" and not directly tied to the relevant contract). Accordingly, the First Circuit vacated the jury award.

As in *Atlantech,* SOLIDFX has failed to present any evidence of direct lost profits. SOLIDFX did not present evidence of profits expected from the License Agreement itself; SOLIDFX instead calculated its lost profits using hypothetical future sales to third parties of the apps it hoped to develop under the License Agreement. These damages were foreseeable and, absent the exclusions in Section 8.2, would be recoverable for breach of the License Agreement. But they do not flow directly from breach of that agreement and are therefore consequential damages.

SOLIDFX disagrees, relying on unprecedential decisions from jurisdictions other than Colorado, and argues that similar types of lost profits have been treated as direct, rather

20

than consequential damages. But the cases cited by SOLIDFX are readily distinguishable. For example, in *Claredi Corp. v. SeeBeyond Technology Corp.*, the district court concluded that despite the waiver of consequential lost profits, the plaintiff could "present evidence to the jury of sales . . . [the plaintiff] would have made if [the defendant] had not breached its duty to make appropriate sales efforts under the Agreement." No. 4:04CV1304 RWS, 2010 WL 1257946, at *6 (E.D. Mo. Mar. 26, 2010) (unpublished); *see also Biovail Pharm., Inc. v. Eli Lilly & Co.*, No. 5:01-CV-352-BO(3), 2003 WL 25901513, at *3 (E.D.N.C. Feb. 28, 2003) (unpublished) (explaining that lost profits may be either direct or consequential damages depending on the nature of the contract and holding that where a supplier breached the contract to supply goods for resale, the lost profits were direct damages); *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 806 (N.Y. 2014) (explaining lost profits may be direct if naturally flowing from the contract or from an *existing* resale contract or may be consequential if stemming from *anticipated* collateral agreements). These cases either lend support to our conclusion that the lost profits here are consequential damages or are simply not on point.

In summary, direct lost profits are profits that would have been generated from the agreement between the contracting parties, while consequential lost profits depend on a separate agreement with a nonparty. SOLIDFX does not dispute that its profits from projected app sales would have come entirely from anticipated contracts with unidentified third parties; SOLIDFX did not anticipate any profits from Jeppesen directly. Consequently, SOLIDFX's lost profits are consequential, not direct, damages.

21

**B.** *Antitrust Claims*

In its cross-appeal, SOLIDFX challenges the dismissal of its antitrust claims for monopolization and attempted monopolization under § 2 of the Sherman Act. But it limits its argument to a single allegation of anticompetitive conduct: Jeppesen's refusal to deal.

Section 2 prohibits monopolization or attempted monopolization of "any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. "Illegal monopolization under § 2 of the Sherman Act has two distinct elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Rural Tel. Serv. Co. v. Feist Publ'ns, Inc.*, 957 F.2d 765, 767 (10th Cir. 1992) (citation omitted). At summary judgment, the district court assumed for purposes of its analysis that SOLIDFX had established Jeppesen's monopoly power in the relevant market. It therefore addressed only the second element, which requires proof of "use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.* (*Kodak I*), 504 U.S. 451, 482–83 (1992) (citation omitted).

"A refusal to deal may be one of the mechanisms by which a monopolist maintains its power." *See Feist Publ'ns*, 957 F.2d at 768. To determine whether a refusal to deal violates § 2, "we apply a two-part test. First, we look at the effects of the monopolist's conduct. Second, we look at its motivation." *Id.* Although a business acting unilaterally "as a general matter . . . can refuse to deal with its competitors, . . . such a right is not absolute;

22

it exists only if there are legitimate competitive reasons for the refusal." *Kodak I*, 504 U.S. at 483 n.32.

The district court again skipped to the second element and determined Jeppesen had a legitimate business justification for its refusal to provide SOLIDFX with the necessary terminal charts and toolkits to develop an iPad app. Specifically, the district court concluded Jeppesen "was properly exercising its right to refuse to license its copyrighted work."

Both the First and Federal Circuits have held that the assertion of intellectual property rights is a presumptively rational business justification for a unilateral refusal to deal. In *Data General Corp. v. Grumman Systems Support Corp.*, the First Circuit "[held] that while exclusionary conduct can include a monopolist's unilateral refusal to license a copyright, an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers." 36 F.3d 1147, 1187 (1st Cir. 1994), *abrogated on other grounds as recognized in Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). The court in *Data General* clarified, however, that the presumption was rebuttable. *Id.* at 1187 n.64.

The Federal Circuit reached a similar conclusion in *In re Independent Service Organizations Antitrust Litigation* (*Xerox*), where it applied Tenth Circuit law but found we "ha[d] not addressed in any published opinion the extent to which the unilateral refusal to sell or license copyrighted expression can form the basis of a violation of the Sherman Act." 203 F.3d 1322, 1328 (Fed. Cir. 2000). The Federal Circuit therefore attempted to decide how we would resolve the issue and turned to precedent from other circuits to inform its analysis. *Id.* In particular, the court recognized and agreed with *Data General* and cited a

23

case in which the Fourth Circuit rejected the plaintiff's illegal tying claim based solely on the defendant's unilateral decision to license copyrighted software to some third parties but not others. *Id.* (citing *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 686 (4th Cir. 1992)).

The Federal Circuit acknowledged that the Ninth Circuit had "adopted a modified version" of the *Data General* standard by "extend[ing] the possible means of rebutting the presumption to include evidence that the defense and exploitation of the copyright grant was merely a pretextual business justification to mask anticompetitive conduct." *Id.* at 1329 (citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.* (*Kodak II*), 125 F.3d 1195, 1219 (9th Cir. 1997)). But the Federal Circuit rejected this approach and instead applied *Data General* as being "more consistent with both the antitrust and the copyright laws and . . . the standard that would most likely be followed by the Tenth Circuit." *Id.* The court declined to examine the defendant's "subjective motivation in asserting its right to exclude under the copyright laws for pretext, in the absence of any evidence that the copyrights were obtained by unlawful means or were used to gain monopoly power beyond the statutory copyright granted by Congress." *Id.* And without such evidence, the defendant's refusal to license copyrighted materials did not support a § 2 claim. *Id.*

We agree with the approach taken by the courts in *Xerox* and *Data General*, particularly because these decisions are consistent with our existing precedent. For instance, in *Novell, Inc. v. Microsoft Corp.*, Novell sought to impose § 2 liability based on Microsoft's refusal to deal. 731 F.3d 1064, 1074 (10th Cir. 2013). Novell alleged Microsoft shared its internal protocols, in an effort to incentivize Novell to write software for

24

Windows 95, but Microsoft then changed course by refusing to grant further access to its protocols. *Id.* We held "that Microsoft's conduct d[id] not qualify as anticompetitive behavior within the meaning of section 2," *id.* at 1080, because "[n]ormally, this sort of unilateral behavior—choosing whom to deal with and on what terms—is protected by the antitrust laws. Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival," *id.* at 1074; *see also Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1223–24 (10th Cir. 2009) (concluding clinic was not required to share its facilities with a competitor); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1196 (10th Cir. 2009) ("[A]ntitrust will not force a resort developer to share its internal profit-making opportunities with competitors.").

To establish an unlawful refusal to deal by Jeppesen, SOLIDFX relies on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In *Aspen*, the Court recognized the right of a business to refuse to deal but clarified the right is not unqualified. *Id.* at 601. There, the defendant ceased participation in a cooperative joint venture and refused to deal with its previous partner even if compensated for doing so. Under such circumstances, the Court found sufficient evidence that the defendant had no valid business justification for its refusal to deal. *Id.* at 608–11.

The Court has since explained that *Aspen* "is at or near the outer boundary of § 2 liability." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). The "limited exception" applies only where the plaintiff can establish the parties had "a preexisting voluntary and presumably profitable course of dealing," and "the

25

monopolist's discontinuation of the preexisting course of dealing must 'suggest[] a willingness to forsake short-term profits to achieve an anti-competitive end.'" *Novell*, 731 F.3d at 1074, 1075 (alteration in original) (quoting *Trinko*, 540 U.S. at 407). In other words, the decision "must be irrational but for its anticompetitive effect." *Id.* at 1075.

SOLIDFX did not present evidence to meet this standard. When SOLIDFX requested access to the relevant toolkits to create an iPad app, Jeppesen refused, asserting its copyrights and its desire to maintain the exclusivity of those rights. This invocation of intellectual property rights was a presumptively rational business justification.[7] *See Xerox*, 203 F.3d at 1328–29; *Data Gen.*, 36 F.3d at 1187. And SOLIDFX did not present any rebuttal evidence to prove Jeppesen acted solely with an anticompetitive motivation. Even though Jeppesen refused to grant access to the toolkit to create an iPad app and the jury concluded Jeppesen breached the License Agreement by its refusal, Jeppesen did not have an independent antitrust duty to share its intellectual property with SOLIDFX. *See Novell*, 731 F.3d at 1074. Thus, the district court correctly concluded Jeppesen was not liable for antitrust damages because it had established a valid business justification for its refusal to deal.

---

[7] SOLIDFX also relies on *FTC v. Actavis*, 133 S. Ct. 2223 (2013), as authority to the contrary. But this reliance is misplaced because *Actavis* was a § 1 case involving potentially collusive behavior among competitors. *Id.* at 2227. It did not address the rationality of a defendant's stated business justification for purposes of a § 2 unilateral refusal-to-deal claim.

26

## III. CONCLUSION

For the above reasons, we reverse the district court's interpretation of Section 8.2 and hold that lost profits are not recoverable under the Licensing Agreement. Even if the License Agreement precluded only consequential lost profits, SOLIDFX's damages fall within that exclusion. We accordingly vacate the portions of the jury's verdict that awarded $20,922,500 in lost profits from SOLIDFX's projected iPad app sales during the initial term of the contract; $21,385,500 for lost business value based on anticipated lost profits after the initial contract term; and $615,000 for lost profits for tailored terminal charts for the iRex device. We also affirm the grant of partial summary judgment on SOLIDFX's antitrust claims.