24CA1630 Incline Energy v PDC Energy 07-03-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1630
Weld County District Court No. 23CV30569
Honorable Todd Taylor, Judge

Incline Energy, LLC,

Plaintiff-Appellant,

v.

PDC Energy, Inc., and Extraction Oil and Gas, Inc.,

Defendants-Appellees.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE DUNN
Brown and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 3, 2025

Fennemore Craig, P.C., Cody C. Bourke, Allison M. Hester, Denver, Colorado,
for Plaintiff-Appellant

Crisham & Holman LLC, John K. Crisham, David C. Holman, Littleton,
Colorado, for Defendant-Appellee PDC Energy, Inc.

Welborn Sullivan Meck & Tooley, P.C., Samuel S. Bacon, David Hrovat, Denver,
Colorado, for Defendant-Appellee Extraction Oil and Gas, Inc.

¶ 1 Plaintiff, Incline Energy, LLC (Incline), appeals the district court's summary judgment in favor of defendants, PDC Energy, Inc. (PDC), and Extraction Oil and Gas, Inc. (Extraction). We reverse the judgment and remand the case for further proceedings.

## I. Background

¶ 2 In two separate transactions, PDC assigned wellbore interests in certain wells to Incline and Extraction. Incline claims that five of those wellbore interests were conveyed twice — first to Incline and later to Extraction — which leads us to the dispute here: whether PDC conveyed the same or different wellbore interests to Incline and Extraction.

### A. The First PDC Transaction

¶ 3 In July 2020, PDC and Raisa II, LLC (Raisa), entered into a purchase and sale agreement (Raisa agreement) and an assignment (Raisa assignment) under which PDC conveyed its "right, title and interest" in "the working interest and net revenue interest in the wellbores of the wells described on Exhibit A" attached to both

1

contracts.[1]  The Raisa agreement and Raisa assignment included wellbores that were "permitted, drilled, or to be drilled in the future."  Along with the wellbores, PDC conveyed, among other things, the associated oil and gas leases "insofar and only insofar as such interests cover the [w]ellbores" and the rights to all oil, gas, and other minerals that may be produced from the wellbores.  PDC reserved its "right, title and interest" in "any other wellbores" besides those identified in Exhibit A.

¶ 4      In total, Exhibit A listed fifty wellbores each identified by several descriptors, including "Pad Name," "Well Name," "Operator," "API," and "Location."[2]

---

[1] The parties and the district court used the terms "wells" and "wellbores" somewhat interchangeably.  Taking our lead from the Raisa agreement, we will refer to the interests in "the wellbores of the wells described on Exhibit A" collectively as "wellbores."

[2] "API" is shorthand for the American Petroleum Institute Well Number.  Though the parties dispute the importance — and perhaps the meaning — of the API number, the American Petroleum Institute defines the API number as a "unique, permanent, numeric identifier assigned for identification purposes to a well (hole-in-the-ground) which is drilled for the purpose of finding or producing oil and/or gas or providing related services."  Am. Petroleum Inst., *API Bulletin D12A, The API Well Number and Standard State and County Numeric Codes Including Offshore Waters* Preface (rev. 1979).

## B.    The Assignment from Raisa to Incline

¶ 5    Also in July 2020, Raisa assigned to Incline a fifty percent interest in the wellbores and related interests that it acquired from PDC (Incline assignment).  The Incline assignment included an Exhibit A listing the same fifty wellbores that PDC had conveyed to Raisa.

## C.    The Second PDC Transaction

¶ 6    In late 2021, PDC sold and assigned to Extraction its "right, title and interest" in several wellbores and related interests identified on exhibits attached to that assignment (Extraction assignment).

## D.    The Disputed Wellbores

¶ 7    Recreated below from Exhibit A to the Raisa assignment are the five wellbores that Incline alleges PDC conveyed twice (disputed wellbores):

3

| Pad Name | Well Name | Operator | API No. | Location |
|---|---|---|---|---|
| CBJ FED | CBJ Fed 15W-25-12 | Extraction | Pending | SENE 6-5N-65W |
| CBJ FED | CBJ Fed 15W-25-2 | Extraction | Pending | SENE 6-5N-65W |
| GP | GP Hillside Fed 17W-20-11N | Extraction | 05-123-44428 | NENE 20-5N-65W |
| GP | GP J Evans Fed 20W-20-17N | Extraction | 05-123-44426 | NENE 20-5N-65W |
| GP Cody Fed | GP Cody Fed 20E-15-5N | Extraction | 05-123-50284 | NENE 20-5N-65W |

A table excerpting the five disputed wellbores as described on Exhibit A to the Raisa assignment.[3]

¶ 8    And recreated below from Exhibit B-1 to the Extraction assignment are purportedly the same five disputed wellbores:

| Well Name | API No. | Operator Name | Tshp | Rng | Sec | SHL |
|---|---|---|---|---|---|---|
| GP CBJ FED 17W-25-01 | 05-123-44427 | Extraction | 5N | 65W | 20 | NENE |
| GP CBJ FED 17W-25-02 | 05-123-44428 | Extraction | 5N | 65W | 20 | NENE |
| GP CBJ FED 17W-25-03 | 05-123-44426 | Extraction | 5N | 65W | 20 | NENE |
| GP CBJ FED 17W-25-04 | 05-123-50284 | Extraction | 5N | 65W | 20 | NENE |
| GP CBJ FED 17W-25-05 | 05-123-24173 | Extraction | 5N | 65W | 20 | NENE |

A table excerpting the five disputed wellbores as identified in Exhibit B-1 to the Extraction assignment.

---

[3] In its opening brief, Incline singled out seven wellbores that PDC assigned to Extraction.  Three of those seven wellbores had API numbers identical to wellbores assigned to Incline.  The remaining four wellbores had pending API numbers.  Incline, however, only contests the ownership of two of the wellbores with pending API numbers.  Thus, as Incline confirms in its reply brief, the dispute is "centered on the ownership of five" wellbores.

¶ 9    Raisa later assigned its remaining fifty percent interest in the disputed wellbores to Incline.

### E.    The Litigation

¶ 10    After the Extraction assignment, Incline sued PDC and Extraction.  In its complaint, Incline alleged that, before the Extraction assignment, Extraction had offered to buy the disputed wellbores from Incline.  After Incline refused to sell them to Extraction, PDC allegedly went ahead and conveyed the disputed wellbores to Extraction.

¶ 11    Incline asserted nine claims for relief, some of which were dismissed along the way.  As for the claims that survived, Incline asserted that PDC (1) breached the Raisa assignment by selling the disputed wellbores to Extraction[4] and (2) breached the implied covenant of good faith and fair dealing.  Incline also asserted that both PDC and Extraction were unjustly enriched and sought declaratory relief and to quiet title in the disputed wellbores.

---

[4] Though the complaint didn't separately reference the Raisa agreement, the Raisa assignment is expressly "subject to the terms and conditions of" the Raisa agreement.

¶ 12   PDC and Extraction each moved for summary judgment, arguing, among other things, that the various contracts were unambiguous and that a simple comparison of the exhibits reflecting the conveyed wellbores plainly showed that they were different.  More specifically, PDC and Extraction argued that the Raisa agreement conveyed only the fifty wellbores identified on Exhibit A, and the five disputed wellbores were not the same wellbores later conveyed to Extraction because the wellbores on Exhibit B-1 to the Extraction assignment had different well names.  In support, PDC and Extraction both pointed to evidence attached to their respective motions.

¶ 13   Incline responded that genuine issues of material fact remained concerning whether PDC had conveyed the disputed wellbores twice.  It argued that because some of the disputed wellbores shared several identical descriptors — such as the pad name, operator, API number, and location — whether the conveyed wellbores were the same or different could not be determined on the face of the various contracts and exhibits, and extrinsic evidence was needed to resolve that question.  Incline then pointed to extrinsic evidence that showed Extraction, as the operator of the

wells, could change the well names (and, in fact, had changed the well name for two of the disputed wellbores). Thus, Incline argued that the well names were not dispositive for determining whether PDC conveyed the same wellbores twice.

¶ 14   The district court determined that the contracts were not ambiguous and, therefore, that it could not consider extrinsic evidence. Then, without explaining which descriptors it deemed dispositive, the court determined that "[n]one of the disputed wellbore interests claimed by Incline appear on Exhibit 'A'" and concluded as a matter of law that PDC conveyed different wellbores to Incline and Extraction. The court didn't address the overlap in the descriptors of the disputed wellbores or the import of the identical API numbers for three of those wellbores. The court entered summary judgment in favor of defendants on all of Incline's claims, though it didn't separately analyze the unjust enrichment, implied duty of good faith and fair dealing, quiet title, or declaratory judgment claims.

## II.   Summary Judgment

¶ 15   Incline appeals the summary judgment, contending that the district court erred in multiple ways. But we needn't address each

argument because we agree with Incline that the various contracts on their face don't plainly and unambiguously answer the question of whether PDC conveyed the same wellbores to Incline and Extraction.

## A. Preservation

¶ 16    PDC and Extraction question whether Incline preserved all its appellate arguments. But Incline objected to summary judgment under the plain terms of the various contracts. It also argued that the contracts were ambiguous and that disputed material facts concerning whether PDC conveyed the same wellbores to Incline and Extraction precluded summary judgment. Thus, the issues Incline raises on appeal were presented to the district court, and the district court had an opportunity to rule on them; that's all that's required for preservation. *See Kritzer v. Qwest Corp.*, 2025 COA 54, ¶ 23.

## B. Standard of Review and Legal Principles

¶ 17    We review de novo the district court's grant of summary judgment. *Univ. of Denver v. Doe*, 2024 CO 27, ¶ 7. Summary judgment is a drastic remedy and should only be granted when the pleadings and supporting documents show that no disputed issue

of material fact exists and that the moving party is entitled to a judgment as a matter of law. *Id.*; C.R.C.P. 56(c). The moving party bears the burden of establishing the lack of a triable factual issue, and "[t]he party opposing summary judgment, by contrast, is entitled to the benefit of all favorable inferences that may reasonably be drawn from the facts." *Doe,* ¶ 8.

¶ 18    We also review de novo the interpretation of a contract. *French v. Centura Health Corp.*, 2022 CO 20, ¶ 24. When interpreting a contract, our primary goal is to give effect to the parties' intent. *Id.* at ¶ 25. We discern that intent primarily from the language of the contract itself. *Id.* We first determine whether the contract's terms are ambiguous by examining the contract's plain language. *Id.* If the contract is unambiguous, we will enforce it as written. *Id.* But if the contract is ambiguous, meaning its terms are susceptible of more than one reasonable interpretation, then extrinsic evidence is admissible to establish the parties' intent. *Id.*

### C.    The Disputed Wellbores

¶ 19    Incline maintains that because the Raisa agreement and the various assignments don't answer the question of whether PDC

conveyed the disputed wellbores twice, extrinsic evidence is needed to resolve that question.[5]  We agree.

¶ 20      To be sure, Exhibit A from the Raisa assignment and Exhibit B-1 from the Extraction assignment reflect wellbores with different well names.  But the exhibits also reflect that the disputed wellbores share several specific descriptors, including pad name, operator, API number, and location.  Indeed, three of the five disputed wellbores share identical API numbers.  The parties dispute the import of the well name and identical API numbers.  And all do so by referencing materials outside the Raisa agreement and the various assignments.

¶ 21      For example, in its complaint, Incline alleged that API numbers are "unique and permanent" identifiers "assigned to each well."  Then, in opposition to summary judgment, Incline relied on extrinsic evidence to argue that

- the Colorado Energy and Carbon Management Commission (ECMC) considers API numbers to be the "national standard

---

[5] The contours of Incline's arguments are somewhat imprecise, but as we understand it, they boil down to one central point: extrinsic evidence is needed to resolve whether PDC conveyed the same wellbores twice.

10

to uniquely identify all oil and gas wells, and wells associated with oil and gas operations";

- the ECMC issues an API number after it approves a well permit, and API numbers stay the same regardless of how many times a well name changes;

- three of the disputed wellbores had identical API numbers (along with other identical descriptors), while two of the disputed wellbores were not identified by API number in the Raisa assignment because the API numbers were "pending" at the time;

- for the two disputed wellbores with pending API numbers, those wellbores had "AFE" numbers that matched to wellbores for which Incline had assumed significant outstanding liabilities payable to Extraction;[6]

- Extraction had discretion to change well names; and

---

[6] In the oil and gas industry, "AFE" means "Authority for Expenditure" or "Authorization for Expenditure." 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* 29 (2014).

- for the two disputed wellbores with matching AFE numbers (but pending API numbers), Extraction had changed those well names.

Given this, Incline emphasized the importance of the API number in identifying the disputed wellbores and discounted the import of the other descriptors, particularly the well name.

¶ 22    By contrast, Extraction argued that "only each [w]ell's actual name is unique and determinative" for each of the fifty wellbores identified in the assignments. In support, Extraction referenced extrinsic evidence suggesting that the well name reflected the wellbore's location and production target. And Extraction minimized the import of the API numbers in identifying the disputed wellbores by again citing extrinsic evidence indicating that the ECMC reuses API numbers for different wells and had done so for some of the disputed wellbores (though Extraction attached this evidence to its summary judgment reply, leaving Incline no ability to respond).

¶ 23    PDC too supported its argument that the well name, and not the API number, was dispositive in identifying the disputed wellbores by pointing — not to the plain language of the Raisa

agreement and the various assignments — but to extrinsic evidence such as well permits, affidavits, and deposition testimony. And though Extraction and PDC both maintain on appeal that the Raisa agreement and various assignments are unambiguous and show that PDC conveyed different wellbores to Incline and Extraction, they again do so by reference to the same extrinsic evidence.[7]

¶ 24    All this is to say, the Raisa agreement and the various assignments do not plainly and unambiguously answer the pivotal question in this litigation: whether PDC conveyed any of the five disputed wellbores more than once. Though Exhibit A is plain on its face, as is Exhibit B-1, what they mean is susceptible of more than one reasonable interpretation. *See Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 380 (Colo. 2000) (Hobbs, J., dissenting) ("A latent ambiguity exists where the language of the document, although clear on its face, is susceptible to more than one meaning."); *see also Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 812 (6th Cir. 2007) (observing that latent

---

[7] PDC especially leans on a substantial amount of extrinsic evidence that the district court didn't consider in granting summary judgment.

ambiguity doesn't stem from the document's language "but instead arises from a collateral matter when the document's terms are applied or executed") (citation omitted).  And as demonstrated by the parties' reliance on it, extrinsic evidence is needed to resolve that question.  *See Sch. Dist. No. 1 v. Denver Classroom Tchrs. Ass'n*, 2019 CO 5, ¶ 14 (explaining that if a contract is ambiguous, "the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues") (citation omitted); *see also Comet Energy Servs., LLC v. Power River Oil & Gas Ventures, LLC*, 2008 WY 69, ¶¶ 5-14 (reversing entry of summary judgment because material questions of fact existed about the interests conveyed in the sale and assignment of an oil and gas well); 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* 1140 (2014) (noting that "the nature and scope of the rights that are conveyed using a well bore assignment, if not stated expressly, may be difficult to define").

¶ 25     But even if we assume that the various assignments and related exhibits are not susceptible to any ambiguity, because the various assignments don't plainly tell us whether PDC conveyed any of the five disputed wellbores more than once, disputed facts still

14

exist as to whether PDC breached its obligations under the Raisa agreement. That's a factual question. *See Lake Durango Water Co. v. Pub. Utils. Comm'n*, 67 P.3d 12, 21 (Colo. 2003) ("Once the terms of the agreement have been identified, the fact finder must determine whether the party accused of breaching has performed its obligations under the contract.").

¶ 26    For these reasons, and resolving all doubts in Incline's favor and against Extraction and PDC, *see Doe*, ¶ 8, we conclude that disputed issues of material fact preclude summary judgment. And because the district court appears to have rejected all of Incline's remaining claims based on the face of the Raisa agreement and various assignments, our ruling necessarily revives Incline's remaining claims for (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) quiet title; and (5) declaratory judgment.

## III.   The Sole Remedy Clause

¶ 27    PDC alternatively contends that we may affirm the summary judgment in its favor on a separate basis. PDC argues that Incline's claims against it are barred by the sole remedy clause in the Raisa

agreement (to which no one disputes that Incline is bound).[8]  We disagree.

¶ 28     Section 5.6 of the Raisa agreement states:

> ***Survival; Sole Remedy.***  Notwithstanding any legal requirement regarding any statute of limitation to the contrary, the representations and warranties set forth in Article 4, and the indemnification remedy for breach thereof under this Article 5, shall survive Closing until the date that is twenty-four (24) months from the Execution Date.  *The terms and provisions of this Article 5 shall be the sole and exclusive remedy of the Parties with respect to the Transaction and the representations, warranties, covenants and agreements set forth in this Agreement, and are in lieu of, and each Party hereby waives, any and all other remedies available, whether at law, in equity or otherwise.*  No Party shall be liable to the other Party for consequential, exemplary, special or punitive damages, except to the extent such damages would be subject to the indemnity obligations in this Article 5 with respect to any third party claimant.

(Second emphasis added.)

¶ 29     As before, we review de novo the interpretation of a contract.

*French*, ¶ 24.

---

[8] PDC raised this argument in its motion for summary judgment, but because the district court disposed of the claims on a different basis, the district court didn't address it.

16

¶ 30    PDC argues that Section 5.6 is a valid limitation of liability provision that limits Incline "to the remedies set forth" in Article 5 and, therefore, that Incline has "waived any and all remedies" other than those in Article 5.

¶ 31    But beyond this lone assertion, PDC doesn't develop any argument explaining whether the remedies in Article 5 apply only to claims stemming from the representations and warranties in Article 4 (as suggested by the first sentence and the conjunctive "and" in the second sentence that includes "covenants and agreements") or, if not, how Article 5 covers a claim that PDC breached the Raisa agreement by assigning the disputed wellbores twice.  Nor does PDC address whether Incline's claims are covered under the remedies in Article 5.  Because PDC's argument is conclusory and undeveloped, we decline to address it further.  *See Trudgian v. LM Gen. Ins. Co.*, 2024 COA 87, ¶ 31 (declining to address a "skeletal and conclusory" argument); *Taylor v. Taylor*, 2016 COA 100, ¶ 13 (declining to address a "conclusory" argument that "fail[ed] to address the real issue").

¶ 32    Next, PDC claims that because Section 5.6 bars consequential damages, Incline may not seek "consequential damages in the form

17

of lost profits." No doubt, the Raisa agreement bars the recovery of consequential damages. But it's not clear at this juncture whether Incline seeks indirect consequential damages or direct damages. And since not all lost profit damages are indirect damages, it's simply premature to determine whether Incline's claimed damages are consequential or direct. *See SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 839 (10th Cir. 2016) (explaining that although "[t]he Colorado Supreme Court has not expressly defined when lost profits qualify as consequential damages," it "would recognize that lost profits can be either direct or consequential damages . . . based on its ordinary rule that direct damages flow directly from the breach of the contract with the breaching party, while consequential lost profits flow from losses beyond the scope of that contract").

## IV. Disposition

¶ 33 We reverse the judgment and remand the case for further proceedings.

JUDGE BROWN and JUDGE SCHOCK concur.

18